Filed 5/26/23  In re H.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re H.M. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>T.R. et al.,<br><br>Defendants and Appellants. | E080124<br><br>(Super.Ct.Nos. J291848, J291849, J291850, J291851)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Erin K. Alexander, Judge.  Affirmed.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant T.R.

Tracy M. De Soto, under appointment by the Court of Appeal, for Defendant and Appellant D.W.

Tom Bunton, County Counsel, Tiffany Lok, Deputy County Counsel, for Plaintiff and Respondent.

1

D.W. (Father) and T.R. (Mother) appeal from the juvenile court's dispositional order denying them family reunification services. The court bypassed reunification services for the parents on the basis of subdivision (b)(6) of Welfare and Institutions Code section 361.5 (severe sexual abuse or severe physical harm to the child or the child's sibling). (Unlabeled statutory citations refer to this code.) The parents argue that the court's findings under the bypass provision are not supported by substantial evidence. They also argue that the court erred by not finding that reunification is in the best interests of their children.[1] (§ 361.5, subd. (c)(2).) We reject their challenges and affirm the dispositional order.

## BACKGROUND

At the time of the relevant events, the family home consisted of the parents and five children: two-year-old twins, C.M. and H.M., five-year-old M.R., 13-year-old B.R., and 16-year-old Daniel M. Mother is the biological parent of all the children except Daniel, who is not a subject of this appeal. Daniel is Father's son with a former partner. The court found Father to be the presumed father of C.M., H.M., and M.R. The court denied Father's request for presumed father status with respect to B.R.

I. *Prior Child Welfare History*

The family previously lived in Utah. Between 2016 and 2018, the Utah Division of Child and Family Services investigated allegations that the parents engaged in domestic violence and that Mother abused substances. Father also allegedly chased B.R.

---

[1] Each parent joins in the other's arguments.

with a knife. The Utah agency opened two voluntary cases, but the parents did not participate in services, and the cases were closed.

San Bernardino County Children and Family Services (CFS) received referrals regarding the family in February and September 2021. The February referral alleged domestic violence between the parents, and the September referral alleged that the family was living in unsanitary conditions. The family lived on the reservation of the Chemehuevi Indian tribe. (Father is an enrolled member of the tribe.) In both cases, the allegations were determined to be unfounded, but the tribe attempted to provide the family with services.

II. *Referral and Detention in the Present Case*

The present case began in January 2022, when CFS received a referral alleging sexual abuse, emotional abuse, and general neglect. The parents allegedly were using drugs and fighting. Father locked Mother out of the house. The reporting party heard Mother accuse Father of being a child molester and yell, "'[A]ll you do is touch my daughter,'" and "'[G]o touch my daughter some more.'" (C.M. is the sole female child in the home.)

The Indian Child Welfare Act (ICWA) coordinator of the Chemehuevi tribe reported that Mother was using methamphetamine. Neighbors had told the ICWA coordinator that domestic violence between the parents was ongoing. A maternal aunt and uncle in Utah had recently taken B.R. to their home because Mother was planning to enroll in a treatment program, and B.R. did not get along with Father. B.R. told maternal

aunt that Father punched him in the face and pushed him. The child also said that Mother recently beat Father with a broom and broke a window in the children's presence.

When the social worker visited the home, Mother appeared to be under the influence and was confrontational with the worker. She admitted to using methamphetamine recently. Father reported that he had not used drugs in several years and only occasionally drank beer. According to both parents, their arguments did not get physical. Mother said that she had accused Father of sexual abuse because she was mad at him, but he had never touched the children inappropriately.

Daniel denied any abuse or neglect. B.R. spoke to the social worker by phone from Utah. He said that the parents argued and fought, and when the social worker asked if the fights ever became physical, B.R. hung up the phone and would not answer the worker's calls after that. M.R. had a severe speech impediment. His teacher warned the social worker that she might have trouble understanding him, but the worker understood much of what the child said. M.R. described some incidents of domestic violence between the parents. When the social worker tried to ask about another incident, the child did not seem to understand. The twins, C.M. and H.M., were too young to be interviewed.

CFS filed petitions alleging that C.M., H.M., M.R., and B.R. were described by various subdivisions of section 300. The petitions specifically alleged that Mother had an unresolved substance abuse problem, the parents engaged in domestic violence in the

4

children's presence, and Father physically abused B.R., placing the other children at risk for similar abuse.

In January 2022, the court detained the children and ordered weekly supervised visits for both parents. The court also ordered CFS to provide the parents with predisposition services.

III. *Predisposition Services and First Amendment to the Petitions*

CFS placed C.M., H.M., and M.R. in the same foster home. The maternal relatives had returned B.R. to California, and CFS placed him in a separate foster home.

When interviewed for the jurisdiction/disposition report, Mother denied that Father had physically abused B.R. She claimed that B.R. fabricated the allegations because he wanted to live with maternal relatives. Father also denied the allegations. He recalled a verbal argument with B.R. during which Father told the child to go outside and accidentally hit B.R. with the door as he opened it. Father acknowledged that he "need[ed] to work on himself."

As for the substance abuse and domestic violence allegations, Mother admitted that she hit Father "'a couple of times.'" She also said that she threw a broom at Father and broke a window on other occasions. The children witnessed their fights. She stated that she was the abusive one in the relationship and became paranoid when she used drugs. Many of their arguments occurred because she was jealous and worried that Father was cheating on her. She admitted that she was using methamphetamine multiple times per day. Maternal grandmother had introduced Mother to methamphetamine when

5

Mother was only 10 years old. Father also acknowledged that their fights became physical. When Mother was using, she often accused him of cheating on her. He said that if he hit Mother, then it was in self-defense. He reported that he "'dabble[d]'" with methamphetamine but had been clean for four to five months. He used when Mother was using, in order to appease her. He felt that he was able to stop using without treatment. Father said that he used medicinal marijuana to help him sleep.

Mother reported that B.R. was conceived when her stepfather raped her. Her stepfather had sexually abused her for 10 years starting when she was nine years old. She also disclosed that she has bipolar disorder and schizophrenia. She took psychotropic medication to manage her disorder, but she stopped taking it when she became pregnant with C.M. and H.M., and she had yet to resume it. The parents agreed that Mother needed to restart her medication. B.R. also said that Mother needed to take her medication because she was "better" when she was on it. CFS amended the petitions to allege that Mother had an unresolved mental health issue.

The parents received referrals for services, and Mother began a residential treatment program. Her program also provided anger management and parenting education, and she was attending domestic violence classes offsite. She was drug testing negative and meeting all the requirements of her treatment plan. The 30-day report from her program stated that she had made "[s]ome progress toward positive behavioral and lifestyle change" and that she was "becoming a leader in [the program's] sober community." Father drug tested negative for all substances except marijuana.

Both parents completed eight sessions of individual counseling. Mother's therapist opined that Mother had cognitive impairments that were impeding her progress. When the therapist asked Mother what she had learned about protective capacity, Mother said that she could not remember anything. The therapist explained to Mother that they were going to write her progress report and asked what they had discussed in the past six sessions. Mother became aggressive and said that she was retraumatized by the therapist asking what she had learned. She explained that she was also taking four classes and working with a second counselor, and she could not remember everything. She asserted that the therapist should not ask "those kinds of questions" because they trigger her. Mother could not discuss what she had learned without the therapist's "generous prompting of topics." She was quick to speak about her recovery, saying that she had been clean for 98 days, but she appeared to lack insight about how her substance abuse affected the children. She acknowledged that she and Father were at fault for CFS's involvement and that they had "taken turns" using—one parent used while the other stayed with the children. But she also felt that as long as one parent was with the children, the experience "should not have been as traumatic." She also appeared to lack interest in therapy, stating, "'I just want my children back and I'm leaving here next week.'" Overall, the therapist concluded that Mother lacked the insight necessary to increase her protective capacity of the children on a daily basis, and it was "highly probable that at some point the client will likely return to the CFS system."

Father's therapist reported that Father had acknowledged and taken responsibility for his mistakes, demonstrated an understanding of domestic violence and how to maintain a healthy relationship, and developed new and healthy parenting skills. At the same time, the therapist's report noted that Father denied a history of domestic violence in the home; according to Father, he and Mother argued, "but it never got to the point of violence or abuse." The therapist gave Father a positive prognosis, as long as he was able to use the skills learned in therapy.

Both parents also completed a 12-session domestic violence class. The service provider reported that Mother took responsibility for domestic violence in the relationship, demonstrated an understanding of how domestic violence affected the children, and identified healthier communication skills. The provider reported that Father also demonstrated an understanding of how domestic violence affected the children and identified healthier communication skills. The provider gave both parents a positive prognosis, as long as they were able to use the skills learned in the class.

IV. *New Sexual Abuse Disclosures and Second Amendment to the Petitions*

The children's caregiver reported that when the children were playing, C.M. kissed M.R. on the hand and arms; M.R. tried to take off his pants, pointed to his penis, and told C.M. to kiss him there. According to the caregiver, M.R. expressed that he had been physically and sexually abused by older brothers. The foster agency social worker spoke to M.R., who told her that Daniel slammed M.R. on his back. The child also said that he hated Daniel, but he did not disclose any sexual abuse. The foster agency social

worker then spoke to B.R., who told her that Daniel and another teenage boy, Thomas L., were sexually abusing M.R. (Fourteen-year-old Thomas is Daniel's half-sibling.) According to B.R., when Mother was "outside yelling about [someone] being a 'child molester,' she was referring to" Daniel.

Because the initial referral in this case included allegations of sexual abuse, CFS had requested forensic interviews or medical exams of the three youngest children. The results of C.M.'s, H.M.'s, and M.R.'s medical exams were normal, and there were no findings of injury.

B.R. was also referred for a forensic interview after the recent disclosures. During his interview, B.R. said that M.R. told him on multiple occasions that Daniel and Thomas "'touch [M.R.'s] butt' with their fingers and penis 'a lot.'" M.R. thought the touching was "'okay'" because Thomas told him so. Daniel and Thomas also threatened to hurt M.R. M.R. exhibited some "odd" behavior; B.R. described the child putting his buttocks in the air and spreading them.

B.R. described two specific incidents of abuse. The first incident occurred when M.R. was three or four years old, the family lived in Utah, and the parents left M.R. in Daniel's care while the rest of the family went to church. M.R. was crying when B.R. returned home. B.R. saw that M.R.'s anus was "'stretched and bleeding.'" M.R. said that Daniel put his penis inside M.R. B.R. told Mother about the bleeding, so she examined M.R.'s anus. The second incident occurred in the summer of 2021. B.R. saw M.R. orally copulating Thomas.

B.R. told Mother about the abuse multiple times, but she did not seem to believe him until he told her about the oral copulation that he witnessed. She "'kind of believed'" him then. B.R. said that Mother "sometimes" confronted Daniel and Father, which usually resulted in an argument. Mother also tried to ensure that M.R. was not home alone with Daniel and that at least B.R. was also present. B.R. was sad and angry because he did not feel that he could protect M.R. from Daniel, who was bigger than B.R. But B.R. frequently got into physical fights with Thomas in the hope that Thomas would not be allowed to visit the family's home anymore.

M.R. did not disclose any sexual abuse during his forensic interview. The child was friendly and talkative. His demeanor changed when the interviewer asked about possible sexual abuse. M.R. became silent and only shook his head in response, and he made minimal eye contact.

CFS amended the petitions again to allege that the parents knew or should have known that Daniel and Thomas were sexually abusing M.R., the parents failed to protect M.R. from the abuse, and the other children were at substantial risk for similar abuse.

When the social worker interviewed the parents about the sexual abuse, Mother denied that M.R. had been sexually abused and said that none of the children had disclosed such abuse to her. She accused maternal grandmother of making the allegations, stating that maternal grandmother wanted to make Mother's life miserable. According to Father, maternal grandmother had made allegations, so he asked the children about sexual abuse, and all of them denied it.

Not long after that interview, the parents visited the children at a park. The tribal ICWA coordinator supervised the visit and briefly left the family alone when she used the restroom. Afterward, Mother told the ICWA coordinator that B.R. had asked Mother what was happening with the case, and Mother responded that she did not know but that she and Father "'could be facing charges.'" Mother also reported that B.R. said he was lying about the sexual abuse. The ICWA coordinator then spoke to B.R. alone. B.R. said that he never claimed to be lying and that he told Mother "he was going to be telling the truth." The child was upset and crying, and he told the ICWA coordinator, "'I am telling the truth.'" At some point Father told the child, "'[W]e don't remember you saying that bud.'" The ICWA coordinator talked with the parents about "'gaslighting,'" and she was concerned that they did not seem to understand the impact of their words. CFS decided to move the parents' visits back to an office setting.

During a recent conversation with the social worker, Mother reported that Father was drinking all day and was verbally abusive, which caused her to drink. She also stated that she was drinking because she did not want to relapse. Father reported that Mother was having breakdowns and was not on her medication. Mother accused him of having an affair with the social worker. When the social worker visited the parents' home, she noted an empty can of malt liquor on the patio. She observed other alcohol containers around the home. Father refused to allow the social worker into his bedroom. According to the ICWA coordinator, some community members expressed concerns that the parents were arguing at all hours of the night.

11

M.R.'s caregiver reported that the child was playing with dolls and acting as if they were having intercourse. CFS moved M.R. to the same foster home as B.R., and M.R. did not exhibit any sexualized behaviors in the new placement. The foster agency social worker reported that M.R. said he wanted to live with his parents.

CFS submitted referrals for the parents to receive additional counseling and domestic violence classes. The new counseling referrals indicated that the parents needed to address the failure to protect M.R. from sexual abuse. Both parents said that they were willing to participate in more services.

Shortly before the jurisdiction and disposition hearing, Mother contacted the social worker to say that she was willing to do whatever was necessary to protect the children. But she also said that "she does not know what to believe and does not want to call her children liars." She stated that "if something did happen," then she was willing to get a protective order against Daniel, and she and Father had discussed Daniel living elsewhere. Mother asserted that she had been sober for 10 months, she was stable on her medication, she was thinking clearly, and she had changed since the children were detained.

V. *Jurisdiction and Disposition Hearing*

The contested jurisdiction and disposition hearing occurred in November 2022. The court found true the allegations that (1) Mother had an unresolved substance abuse problem and an unresolved mental health issue, (2) the parents engaged in domestic violence in the children's presence, (3) the parents failed to protect M.R. from sexual

abuse by Daniel and Thomas, (4) the parents' failure placed the other children at risk for similar sexual abuse, and (5) Father physically abused B.R. In particular, the court found the sexual abuse allegations true by clear and convincing evidence. On the basis of the sustained allegations, the court found that C.M., H.M., and M.R. were described by subdivisions (b), (d), and (j) of section 300 and that B.R. was described by subdivisions (b) and (d) of section 300.[2]

As for disposition, CFS recommended that the court deny the parents reunification services under section 361.5, subdivision (b)(6). Counsel for the children concurred. B.R.'s counsel stated that the child did not wish to return to Mother's home as long as Father lived there. According to M.R.'s counsel, the child indicated an interest in reunifying but not "under the circumstances that existed in the past."

The court declared C.M., H.M., M.R., and B.R. to be dependents and removed the children from the parents' custody. Under section 361.5, subdivision (b)(6), the court found by clear and convincing evidence that (1) the children had been adjudicated dependents as a result of severe sexual abuse to M.R., and (2) it would not benefit the children to pursue reunification services with the parents. The court also declined to find that reunification services were in the children's best interests. (§ 361.5, subd. (c)(2).) The court therefore denied the parents reunification services.

---

[2]    The court also found that B.R. and M.R. were described by subdivision (g) of section 300, because the whereabouts of their alleged fathers were unknown, and the alleged fathers had left them without any provision for support.

In explaining its ruling, the court reasoned that M.R. had clearly suffered severe sexual abuse. B.R. was clear in his disclosures, and he described a specific incident in which M.R. suffered bodily injury. The evidence also showed that the parents fought about the issue, and Mother referred to Daniel as a sex offender. The court observed that the parents' conduct went beyond negligence; they were informed of the abuse and did nothing to stop it or limit the perpetrators' access to M.R. In addition, there was a history of substance abuse dating back many years, and there was no indication that another 12 months of services would allow the court to safely return the children. The parents had received 10 months of services at that point, yet there were still alcohol containers around the home, and they continued to argue. Further, the parents had not acknowledged the sexual abuse in their home or their lack of protective capacity. As far as the children's wishes, B.R. did not want to return to the home, and M.R. did not want to return under the current circumstances.

After bypassing reunification services, the court did not set the matter for a section 366.26 hearing. It found clear and convincing evidence of a compelling reason not to set such a hearing, because termination of parental rights was not in the children's best interest at that point, and there was no adult willing and able to assume legal guardianship.

## DISCUSSION

I. *Bypass of Reunification Services (subd. (b)(6) of § 361.5)*

Mother and Father argue that the court erred by denying them reunification services, because there is insufficient evidence to support the court's bypass findings under section 361.5, subdivision (b)(6). We disagree.

"Reunification services must be provided to the mother and statutorily presumed father of children who have been removed from their parents' custody, unless a statutory exception applies. [Citations.] The statutory exceptions are contained in subdivision (b) of section 361.5, which provides that '[r]eunification services need not be provided' if the court finds 'by clear and convincing evidence' that any of 17 enumerated bypass provisions apply." (*In re A.E.* (2019) 38 Cal.App.5th 1124, 1141.) Subdivision (b)(6) of the statute provides that reunification services need not be provided if the court finds by clear and convincing evidence that (1) the child was adjudicated a dependent "as a result of severe sexual abuse . . . to the child, a sibling, or a half sibling by a parent," and (2) "it would not benefit the child to pursue reunification services with the offending parent." (§ 361.5, subd. (b)(6)(A).) For purposes of this subdivision, severe sexual abuse includes abuse by the parent or "another person . . . with the actual or implied consent of the parent." (§ 361.5, subd. (b)(6)(B).)

We review an order bypassing reunification services for substantial evidence (*Amber K. v. Superior Court* (2006) 146 Cal.App.4th 553, 561 (*Amber K.*)), taking into account the level of confidence that the "clear and convincing" standard demands

15

(*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995). We ask "whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable" that the facts at issue were true. (*Id.* at pp. 995-996.) We "view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at p. 996.)

A. *Actual or Implied Consent to the Sexual Abuse*

The parents challenge the sufficiency of the evidence that they actually or implicitly consented to M.R.'s severe sexual abuse. We conclude that the record contains substantial evidence supporting the finding of actual or implied consent.

The evidence shows that B.R. told Mother about the abuse multiple times, including after he witnessed oral copulation between M.R. and Thomas in 2021. B.R. indicated that Mother started to believe him when he told her of witnessing that incident. B.R. also described an earlier incident in Utah when M.R. was bleeding from his anus after he stayed home alone with Daniel, and M.R. indicated that Daniel had anally penetrated him. Mother observed the bleeding on that occasion. Mother confronted Father and Daniel about the abuse, and she and Father argued about it. Father asked the children whether they had been sexually abused after hearing from maternal grandmother about it. The court could reasonably infer from that evidence that the parents knew M.R. was being sexually abused by another person in the home and failed to do anything to

16

stop it. And the court could reasonably infer from the evidence of the parents' knowledge and inaction that they implicitly consented to the abuse.

This court's decision in *Amber K.* is instructive. The mother's actions in that case showed that she had implicitly consented to the father's sexual abuse of their daughter. (*Amber K.*, *supra*, 146 Cal.App.4th at p. 561.) The mother permitted the father to visit overnight and have unsupervised contact with their three children, knowing that he had molested their son multiple times seven years earlier. (*Id.* at pp. 558-560.) The abuse of their daughter occurred during the visit. (*Id.* at pp. 558, 560.) We held that substantial evidence supported the finding that the mother implicitly consented to the sexual abuse, because she knew of the father's past offending behavior and nevertheless exposed the children to the risk of sexual abuse by permitting him to stay overnight in the house. (*Id.* at p. 561.) Similarly, Mother and Father knew that M.R. was being sexually abused and allowed the circumstances giving rise to that abuse to continue. Although there was evidence that Mother tried to ensure that B.R. was with M.R. and that the younger child was not alone with Daniel, B.R. was also a child and unable to protect M.R.

Father's reliance on *Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839 (*Tyrone W.*) is unavailing. That case involved different provisions of section 361.5, subdivision (b)(6), namely, the provisions that authorize bypass of reunification services on the basis of "the infliction of severe physical harm" to the child. (§ 361.5, subd. (b)(6)(A); *Tyrone W.*, *supra*, at pp. 842-843.) The statute provides that "the infliction of severe physical harm" includes "deliberate and serious injury inflicted to or on a child's

17

body . . . by an act or omission of the parent . . . or of another individual . . . with the consent of the parent." (§ 361.5, subd. (b)(6)(C).) *Tyrone W.* held that "the words 'deliberate' and 'inflicted' in, and the omission of the phrase 'reasonably should have known' from, section 361.5, subdivision (b)(6) indicates the Legislature did not intend the court to apply a standard of negligence when considering whether to deny reunification services to a parent under subdivision (b)(6)." (*Tyrone W.*, at p. 850.) Rather, "omission and consent both require actual knowledge, if not of the physical harm itself, then of another's abusive acts." (*Id.* at p. 851.)

Citing *Tyrone W.*, *supra*, 151 Cal.App.4th 839, Father argues that he did not know about the sexual abuse, so he was negligent at worst. But the statutory language at issue in *Tyrone W.* is materially different from the language of the sexual abuse bypass provision. *Tyrone W.*'s holding therefore is not controlling. In any event, as already explained, there is substantial evidence that Father knew of the sexual abuse—he learned of it from Mother, who confronted him about it. And the juvenile court was well aware of *Tyrone W.* In announcing its ruling, the court cited *Tyrone W.* and explained that "this [case] goes beyond mere negligence."

Father's reliance on *J.J. v. Superior Court* (2022) 81 Cal.App.5th 447 is unavailing for the same reasons. That case involved the same bypass provisions at issue in *Tyrone W.*, and the court merely applied *Tyrone W.*'s holding. (*J.J.*, *supra*, at pp. 456-457.)

18

For these reasons, we reject the parents' substantial evidence challenge to the finding of actual or implied consent.[3]

B. *No Benefit to the Children From Pursuing Reunification Services*

Mother also challenges the sufficiency of the evidence that it would not benefit the children to pursue reunification services with her. The record contains substantial evidence to support that finding as well.

In determining whether reunification services will benefit a child, "the court shall consider any information it deems relevant," including the specific act or omission comprising the severe sexual abuse, the circumstances under which the perpetrator inflicted the abuse on the child, the severity of the emotional trauma suffered by the child, any history of abuse of other children by the offending parent, the likelihood that the court can safely return the child to the offending parent's care within 12 months with no continuing supervision, and whether the child wants to reunify with the offending parent. (§ 361.5, subd. (i)(1)-(6).)

Substantial evidence supports the court's determination that there was no likelihood the children could safely return to Mother's care within 12 months. The evidence shows that Mother's substance abuse problem and mental health issues persisted, despite her completion of a residential treatment program and months of

---

[3]    Mother additionally argues that subdivision (b)(6) of section 361.5 requires an adult perpetrator of the sexual abuse, and given that Daniel was not an adult, the bypass provision did not apply. However, nothing in the language of the statute requires an adult perpetrator. Rather, the bypass provision applies when the perpetrator is "another person" who acts with the actual or implied consent of the parent. (§ 361.5, subd. (b)(6)(B).) The statute does not require the other person to be any particular age.

counseling. She acknowledged early in the case that she was paranoid when she was using and that the parents argued because she was worried that Father was unfaithful. After completing her program, she claimed to be sober but admitted that she was drinking alcohol to prevent a methamphetamine relapse. And she was exhibiting the same type of behavior that she had earlier—she and Father were arguing at all hours of the night, and she accused him of having an affair with the social worker. Father also said that she was having breakdowns and not taking her medication. The court could reasonably conclude that Mother's persistent substance abuse problem and her failure to treat her mental health disorder would continue and prevent the children's safe return.

The progress report from Mother's therapist also supported the determination that the children could not be safely returned within 12 months. Mother appeared to be participating in therapy at a superficial level, and the therapist concluded that Mother lacked the insight necessary to increase her protective capacity concerning the children. The therapist's conclusion about Mother's protective capacity was particularly probative, given Mother's failure to protect M.R. from sexual abuse. Mother emphasizes that she was willing to get a protective order against Daniel and have him live elsewhere. But even those statements were not a clear acknowledgement that she needed to protect M.R. She stated that she was willing to get the protective order *if* something had happened. She also stated that she was unsure what to believe.

Moreover, Mother's behavior with B.R. supported the court's determination that the children would not benefit from pursuing reunification services with her. She

20

coached B.R. about his sexual abuse disclosures when she was briefly left unsupervised with the child, and she tried to make it appear as though he lied about the abuse. The child was upset and crying after the episode. According to the visitation monitor, Mother did not seem to understand the impact of her words. All of that occurred even after Mother had completed parenting education and therapy, underscoring the therapist's conclusion that Mother lacked the insight necessary to better protect the children.

The court also relied on the older children's wishes. Those too supported the determination that it would not benefit the children to pursue reunification services with Mother. B.R. and M.R. expressed only a limited desire to reunify. B.R. did not want to live with Mother if Father was living in the home, and there was no indication that the parents planned to live separately. M.R. indicated through counsel that he did not wish to reunify under the circumstances that existed in the past. And many of the circumstances had not changed by the time of the disposition hearing, despite the many months of predisposition services.

In sum, the record contains substantial evidence that the children would not benefit from pursuing reunification services with Mother.

II. *Whether Reunification Is in the Children's Best Interests (subd. (c)(2) of § 361.5)*

Mother and Father argue that even if sufficient evidence supports application of the bypass provision, the juvenile court erred by denying them reunification services, because reunification served the children's best interests. The argument lacks merit.

Subdivision (c)(2) of section 361.5 states that if the bypass provision (§ 361.5, subd. (b)(6)) applies, then the court "shall not order" reunification services "unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." In other words, once the court finds that the bypass provision applies, denial of reunification services is mandatory unless the court makes the countervailing factual finding. (*In re A.E.*, *supra*, 38 Cal.App.5th at p. 1141.)

In determining whether reunification is in a child's best interest, the court may consider the "parent's current efforts and fitness as well as the parent's history." (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 66.) "The gravity of the problem that led to the dependency also is relevant to the question of best interest." (*Ibid.*)

The parent bears the burden of showing that reunification is in the child's best interest. (*In re Raul V.* (2022) 82 Cal.App.5th 290, 300; *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) When the juvenile court determines that the parent failed to carry their burden of proof, we ask "'whether the evidence compels a finding in favor of the appellant as a matter of law,' that is, whether the evidence supporting [the parent's] position 'was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*In re Raul V.*, *supra*, 82 Cal.App.5th at p. 301.)

The parents in this case do not argue that the evidence compels a finding in their favor as a matter of law. Nor could they make that showing on this record. Mother relies on the positive reports from her substance abuse treatment program and domestic

22

violence service provider, her positive visits with the children, and her expressed willingness to participate in more services. But she does not address the significant contrary evidence showing her lack of progress after months of services and the particularly problematic visit with B.R. As we explained in Part I.B, *ante*, that evidence supports the court's finding that the children would not benefit from pursuing reunification services with Mother. In light of all that evidence, we cannot say that the evidence in favor of Mother's position was uncontradicted, unimpeached, and so weighty as to compel a finding that reunification served the children's best interests.

Father's argument fares no better. He also relies on the positive reports from his therapist and domestic violence service provider, his willingness to participate in more services, and his positive visits with children. But the evidence of his engagement in services was not uniformly positive and uncontradicted. As already discussed, neighbors reported that he and Mother continued to argue after they completed the domestic violence classes. Mother said that he was drinking all day and became verbally abusive. That evidence undermined his service provider's positive prognosis and the claim that Father had learned healthier communication skills. Further, it is unclear whether Father even acknowledged that domestic violence occurred. When speaking with the social worker for the detention report, he denied that he and Mother engaged in physical violence. In connection with a later report, he admitted that they did, and Mother and the children also reported physical violence. According to his therapist's report, Father said that the parents argued, but he again denied that they engaged in violence. The court was

23

not required to conclude from that conflicting evidence that Father had meaningfully benefitted from the predisposition services or would benefit from more.

Other factors support the court's determination that Father did not carry his evidentiary burden. The sexual abuse of M.R. was especially grave. Yet the record contains no evidence that Father ever acknowledged the seriousness of the abuse or took responsibility for it. Instead, he participated in Mother's improper attempt to coach B.R. about the child's disclosures during a visit, telling the child that the parents did not recall him reporting the abuse. The court also took jurisdiction over the children on the basis of Father's physical abuse of B.R., and Father denied that abuse. Given Father's failures to acknowledge the problems that led to removal of his children, the evidence does not compel a finding in Father's favor as a matter of law.

For all of these reasons, the parents have not shown that the juvenile court erred by failing to find that reunification services were in the children's best interests.

## DISPOSITION

The dispositional order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ_____

J.

We concur:

McKINSTER_____

      Acting P. J.

MILLER_____

      J.